MYERS, P.J.,
Dissenting:
¶ 32. I would not reverse the conviction and judgment in this case because I find no reversible error with the circuit court’s refusal to grant the jury instruction proposed by Ford on justifiable homicide. Based on my review of the record, the whole of the instructions fairly covered Ford’s self-defense claim and provided the jury a complete and accurate version of the law based upon the evidence produced at trial.
*1251 ¶ 33. Ford requested and was denied the following justifiable-homicide instruction, identified in the record as jury-instruction D-5:
If you find from the evidence ... George Ford did shoot and kill Mario Moore ... while the said George Ford was resisting an attempt by Mario Moore and others to unlawfully kill George Ford, to rob him, or to commit any other felony upon him or that George Ford had reasonable grounds to apprehend a design on the part of Mario Moore and others acting in concert with him to commit a felony upon George Ford or to inflict some great bodily harm or personal injury upon the person of George Ford or any other human being and there existed an imminent danger of such design on the part of Mario Moore and or others acting in concert with him being accomplished, then the shooting and killing of Mario Moore by George Ford was justifiable and you shall find George Ford not guilty.
Instead, Ford was granted jury-instruction C-31, which is patterned on the Robinson instruction, the general self-defense instruction recommended by the supreme court in Robinson v. State, 434 So.2d 206, 207 (Miss.1983) (overruled on other grounds). Jury instruction C-31 reads as follows:
The Court instructs the jury to make an assault justifiable on the grounds of self-defense, the danger to the defendant, George Ford, must be either actual, present and urgent, or the defendant, George Ford, must have reasonable grounds to apprehend a design on the part of the victim, Mario Moore, to kill him or to do him some great bodily harm, and in addition to this he must have reasonable grounds to apprehend that there is imminent danger of such design being accomplished. It is for the jury to determine the reasonableness of the grounds upon which the defendant, George Ford, acts.
¶ 34. In addition to jury instruction C-31, Ford’s jury was provided jury instruction C-30, setting forth the elements of the crime of murder, and jury instruction C-34, setting for the elements of heat-of-passion manslaughter. Both instructions directed the jury to decide whether the State’s proof supported, beyond a reasonable doubt, the various elements to each crime. Through both instructions, the jury was informed that the State was required to prove beyond a reasonable doubt that Ford had not acted in self-defense and was told of its duty to acquit Ford if the State failed to meets its burden.
¶ 35. According to the majority, jury instruction C-31 limited the jury’s consideration of Ford’s justifiable-homicide defense to Ford’s right to protect himself, and it removed from the jury’s consideration the additional self-defense theories proposed by Ford. Those theories being: “(a) [Ford] had the right to use deadly force to resist the commission of a felony against him, specifically robbery; (b) he had a right to use deadly force to protect his son if he reasonably feared that his own son was in danger of serious bodily harm or death; and (c) he had a right to use deadly force if he reasonably feared serious bodily harm, death, or the commission of a felony from the entire group that surrounded his car, rather than from Moore alone.” (Maj. opinion at (¶ 15)).
¶ 36. I disagree.
¶ 37. During the jury-instruction conference, the discussion between the parties and the trial judge with regard to proposed jury-instruction D-5 dealt only with Ford’s assertion that he was fearful that a robbery was in progress at the time of the shooting. The record reveals the following colloquy, in pertinent parts, between the trial judge and Ford’s defense counsel:
*1252 BY THE COURT: So what evidence of robbery or attempted robbery?
DEFENSE COUNSEL: Your Honor, ... the only thing that I know that was presented, and I do recall [Ford] saying that he was told by Cash, [Cassius Gal-lion,] you don’t know me, I’ll take something from you.”
BY THE COURT: Okay. If someone says, I’m going to take something from you, does that give you the right to pull out a pistol and kill them?
DEFENSE COUNSEL: Not right then, no, Your Honor. But if they ... start to try to take it by force—
BY THE COURT: But don’t we have instructions to cover that part where he does have the right to pull out his gun and kill him. I think we have instructions covering that part. So D-5 is denied.
¶ 38. As an evidentiary matter, no where in Ford’s testimony, or anyone else’s, was it reported that Gallion said, “I’ll take something from you.” All that is in the record in support of Ford’s robbery assertion is a claim by Ford that when he first encountered Gallion inside the store, Gallion exhibited “bitterness” toward him over a “$5.00” loan Ford had refused Gal-lion a couple of weeks prior. An argument ensued between the two men inside the store, which appeared to end when James Townsend, according to Ford, “grabbed” Gallion and took him outside. The argument resumed outside the store, at the behest of Gallion, while Ford was standing beside his car pumping gas. According to Ford, “that’s when a group of guys, ... bum rushed the car, all of them shouting out, [Gallion] made the statement, you don’t know me, I tell you something.” Ford explained: “While I’m facing [Gal-lion], Mario Moore ... came and I don’t know what he had, but I know where he was at. I don’t know anything, I don’t know if he had a weapon. My life was threatened and I had a ... five year old child in the car, my life threatened. I had ... fear for me and him.” Later during Ford’s testimony, Ford was asked the following question by his defense counsel: “Now, when you fired, what was going through your mind when those people were around your car?” Ford replied: “They were fixing to rob me, you know, by any means necessary, they were going to get what they want.” When asked by defense counsel whether he said anything to the people standing around his car, Ford testified:
I asked them why were they around me; why were they surrounding my car. That’s what I asked them, you know. I had already, [sic] what’s /all’s intention on going over there, what y’all trying to do, you know. But by me talking to [Gallion], my back turned toward Mario when he made the attack. So I really don’t know what he had on him at the time. When he made the attack, I turned around, then I got my gun in the trunk, I lifted it up and got the gun out, you [know] what I’m saying. I cocked it, he still was there. Like I say, I don’t know what was going on in his mind and I shot, just turned around and shot two times in the air just like that.
¶ 89. Mississippi Code Annotated section 97 — 3—15(f) (Rev.2006) provides:
The killing of a human being by the act, procurement, or omission of another shall be justifiable ... [w]hen committed in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.
(Emphasis added). The phrase “reasonable ground to apprehend,” as used in section 97-3-15(f) “implies ‘apparent dan *1253 ger[.]’ ” Dillon v. State, 18 So.2d 457, 457-58 (Miss.1944) (interpreting section 2218(f), Code 1942, which is identical to current section 97-3-15(f)). In Scott v. State, 203 Miss. 349, 353-54, 34 So.2d 718, 719 (1948), it was held:
[T]he term apparent danger, as applied in cases of homicide, means such overt demonstration, by conduct and acts, of a design to take life or do some great personal injury, as would make the killing reasonably apparently necessary to self-preservation or to escape great bodily harm. Section 2218(f), Code 1942, makes homicide justifiable[:] When committed in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.
(Internal quotation omitted). “The actor’s apprehension of danger must be objectively reasonable before his homicide is justified.” Cook v. State, 467 So.2d 203, 207 (Miss.1985) (citing Robinson, 434 So.2d at 207). “Where the actor’s apprehension is only subjectively, in his or her own mind, reasonable, the homicide is ... manslaughter.” Id. The jury is the judge of the reasonableness of the actor’s belief, and the belief “must appear objectively real to a reasonable person of average prudence.” Jones v. State, 39 So.3d 860, 865 (¶ 28) (Miss.2010).
¶ 40. I find it difficult to conclude from the facts and circumstances attending this case that a rational juror, even while simulating those facts and circumstances as they may have appeared to Ford at the time, could have found in accordance with Ford’s belief that a robbery was in progress. Nevertheless, as the trial court found, jury instruction C-31 accurately addressed Ford’s robbery theory. The danger described to Ford’s jury through instruction C-31 is the same danger that characterizes the crime of robbery, and Ford’s jury concluded that no such danger was present in this case. Further, proposed instruction D-5 merely referred to the act of robbery in the abstract; thus, it had the potential of misleading the jury. Robbery, it must be remembered, is considered a crime against the person, not against property. Woods v. State, 883 So.2d 583, 588 (¶ 10) (Miss.Ct.App.2004).
¶ 41. With respect to Ford’s claim that he feared his son was in danger of serious bodily harm or death, there was insufficient evidence to support the reasonableness of such a claim. As Ford acknowledged during his testimony, the fracas that occurred around his vehicle involved him, not his son. And the fact that it occurred in close proximity to Ford’s son did not in and of itself justify Ford’s belief. Further, Ford indicated in his testimony that the danger he believed had confronted his son was due to the danger posed to him, the alleged presence of which was rejected by Ford’s jury.
¶ 42. Lastly, I do not find that the evidence in this case warranted an instruction to consider the threat posed by “others.” In Wood v. State, 81 Miss. 408, 413, 33 So. 285, 286 (1903), the case relied upon by the majority, the defendant shot and killed an individual who the defendant mistakenly believed was part of a hostile group of armed individuals who were in immediate pursuit of the defendant. Distinguishable from Wood there was no attacking group in this case; there was only Moore. Ford responded to Moore’s actions, and his alone.
¶ 43. For these reasons, I respectfully dissent.